**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

------------------------------------- X
:
UNITED STATES OF AMERICA,                        :        Crim. No. 10-CR-329-ABJ-3
:
                                   *Plaintiff*,  :        **Motion to Reduce Sentence**
                                                 :        **Pursuant to 18 U.S.C.**
– v. –                                           :        **§ 3582(c)(1)(A)(i)**
:
                                                 :        **Oral Argument Requested**
MIGUEL A. ORDAZ,                                 :
:
                                   *Defendant*.  :
:
:
------------------------------------- X

<u>**MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**</u>

DEBEVOISE & PLIMPTON LLP
Taylor Booth (NYSB 5866835)*
Maxwell D.A. Dikkers (NYSB 6073068)*
Isabel Gutenplan (NYSB 6180830)*
66 Hudson Blvd.
New York, NY 10001
tebooth@debevoise.com
mddikkers@debevoise.com
iagutenplan@debevoise.com
Phone:  (212) 909-6000

*Counsel to Miguel A. Ordaz*
* Admitted Pro Hac Vice

WOODHOUSE RODEN AMES &
BRENNAN, LLC
Deborah Roden (Wyo. Bar 6-3866)
1912 Capitol Avenue, Suite 500
Cheyenne, Wyoming 82003
debb@wrablaw.com
Phone:  (307) 432-9399

*Counsel to Miguel A. Ordaz*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 4

ARGUMENT ...................................................................................................... 9

I.     Extraordinary and Compelling Circumstances Warrant a Reduction in Ordaz's Sentence ................................................................................................... 10

     A.     Ordaz's Excessively Long Sentence and the Change in the Law Are Extraordinary and Compelling Reasons That Warrant a Reduction Under § 1B1.13(b)(6)................................................................................. 12

     B.     Under § 1B1.13(b)(5), the Combination of Ordaz's Rehabilitation, the Gross Disparity Between His Sentence and the Sentences of His Co-Defendants and His Strong Family Ties Constitutes an Additional Extraordinary and Compelling Reason Warranting a Reduction ........................ 14

II.     The § 3553(a) Factors Weigh Strongly in Favor of Reducing Ordaz's Sentence ............ 21

III.     Ordaz Is Not Dangerous.................................................................................... 23

CONCLUSION.................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Carter v. United States*, 145 S. Ct. 2775 (2025) ..............................................................3

*Deal v. United States*, 508 U.S. 129 (1993) .....................................................................13

*Kelly v. United States*, 789 F. Supp. 3d 434 (E.D. Va. 2025) ........................................4

*Pepper v. United States*, 562 U.S. 476 (2011) ...........................................................21, 22

*United States v. Barkley*, No. 04-CR-119, 2024 WL 5233183 (N.D. Okla. Dec. 27, 2024) .........................................................................................................................14

*United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) ...................................................3

*United States v. Brooks*, 717 F. Supp. 3d 1087 (N.D. Okla. 2024) .................................10, 17–18

*United States v. Carrera Ramirez*, No. 2:00-CR-105-3, 2024 WL 54429 (D. Utah Jan. 4, 2024) ....................................................................................................................10

*United States v. Chen*, 48 F.4th 1092 (9th Cir. 2022) ......................................................3

*United States v. Crenshaw*, No. 2:90-CR-117, 2025 WL 618869 (E.D. Va. Feb. 26, 2025) ...........................................................................................................................16

*United States v. Cruz*, No. 3:94-CR-112, 2021 WL 1326851 (D. Conn. Apr. 9, 2021) ............................................................................................................................16

*United States v. Doddles*, No. CR-06-136, 2024 WL 4521379 (W.D. Okla. Oct. 17, 2024) .....................................................................................................................14, 18

*United States v. Duluc-Mendez*, 156 F.4th 55 (1st Cir. 2025) ........................................3

*United States v. Eads*, 749 F. Supp. 3d 1149 (D. Colo. 2024)........................................14

*United States v. Eccleston*, 573 F. Supp. 3d 1013 (D. Md. 2021) ..................................18

*United States v. Espino*, No. 03-20051-08, 2022 WL 4465096 (D. Kan. Sept. 26, 2022) .............................................................................................................................16

*United States v. Gantt*, No. 10-10175-01, 2023 WL 2140151 (D. Kan. Feb. 21, 2023) .........................................................................................................................11, 19

*United States v. Johnson*, No. 05-CR-00167, 2021 WL 5037679 (N.D. Cal. Oct. 30, 2021) .....................................................................................................................18

*United States v. Locust*, 771 F. Supp. 3d 819 (E.D. Va. 2025)......................................17

*United States v. Malone*, No. 99-CR-12, 2021 WL 2371605 (N.D. Okla. June 9, 2021) ................................................................................................15

*United States v. Martinez Encinas*, 682 F. Supp. 3d 993 (D.N.M. 2023) ....................................11

*United States v. Martinez*, No. 2:01-CR-564, 2024 WL 866822 (D. Utah Feb. 29, 2024) ......................................................................................................3, 13

*United States v. Mason*, No. 03-0321-4, 2023 WL 24169 (D. Md. Jan. 3, 2023) ........................18

*United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021) ..........................................1, 3

*United States v. McGee*, 992 F.3d 1035 (10th Cir. 2021)....................................1, 3, 9

*United States v. Moreira*, No. 06-20021-01, 2024 WL 378032 (D. Kan. Jan. 31, 2024) ......................................................................................................10

*United States v. Ogun*, 657 F. Supp. 3d 798 (E.D. Va. 2023) ................................14–15

*United States v. Payne*, No. 94-CR-150, 2022 WL 2257044 (N.D. Okla. June 23, 2022) ......................................................................................................11

*United States v. Payton*, No. 06-341, 2021 WL 927631 (D. Md. Mar. 11, 2021)..................18–19

*United States v. Ruvalcaba*, 26 F.4th 14 (1st Cir. 2022) ..............................................3

*United States v. Taylor*, No. CR 03-04, 2025 WL 2210414 (D. Mont. Aug. 4, 2025) ........................................................................................................4

*United States v. Tuakalau*, 598 F. Supp. 3d 1222 (D. Utah 2022) ................................22

*United States v. Urkevich*, 8:03-CR-37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) ......................................................................................................23

*United States v. Ware*, 720 F. Supp. 3d 1351 (N.D. Ga. 2024) ................................18

*United States v. Watts*, No. 92-CR-767, 2023 WL 35029 (E.D.N.Y. Jan. 4, 2023)....................22

*United States v. Williams*, No. 5:94-CR-39, 2024 WL 4189735 (M.D. Ga. Sept. 13, 2024) ......................................................................................19–20

*United States v. Wright*, No. 07-CR-0038, 2025 WL 1202057 (N.D. Okla. Apr. 25, 2025) ......................................................................................13–14

**Statutes**

18 U.S.C.
§ 924(c) ................................................................................ *passim*
§ 1956(a) & (h) .................................................................................7
§ 3142(g) ................................................................................23, 24
§ 3552(a) ..........................................................................................21
§ 3553(a) ................................................................................ *passim*
§ 3582(c)(1)(A) ...................................................................... *passim*

21 U.S.C.
§ 841 .................................................................................................7
§ 846 .................................................................................................7

28 U.S.C. § 994 ...........................................................................9, 14

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ................................... *passim*

**Other Authorities**

Amendments to the Sentencing Guidelines, Policy Statements, Official
    Commentary, and Statutory Index, U.S. Sent'g Comm'n (2023),
    https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-
    amendments/202305_Amendments.pdf .......................................................11, 12

Br. for the United States in Opp'n to Grant of Cert., *Jarvis v. United States*, 142 S.
    Ct. 760 (2022) (No. 21-568) ...............................................................................9

Fed. Bureau of Prisons, Directory of National Programs (2017),
    https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationa
    lProgramCatalog.pdf ....................................................................................16

*Interactive Data Analyzer*, U.S. Sent'g Comm'n (2024),
    https://ida.ussc.gov/analytics/saw.dll?Dashboard ...........................................12

Pet. for Writ of Cert., *Carter v. United States*, 145 S. Ct. 2775 (2025) (No. 24-
    860) ....................................................................................................................3

U.S.S.G. § 1B1.13 .................................................................................... *passim*

Miguel Ordaz, through counsel, respectfully moves this Court under 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence based on the "extraordinary and compelling reasons" discussed below. The Tenth Circuit held in *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) and *United States v. McGee*, 992 F.3d 1035, 1046–48 (10th Cir. 2021) that bone-crushing sentencing disparities created by non-retroactive changes in the law, as part of an individualized analysis, can constitute extraordinary and compelling circumstances warranting a sentence reduction. Subsequently, the United States Sentencing Commission reaffirmed the Tenth Circuit's approach through the amended provisions in U.S.S.G. § 1B1.13. Under § 3582(c)(1)(A)(i) and both § 1B1.13(b)(5) and § 1B1.13(b)(6), this Court has the authority to reduce Ordaz's sentence to a more just term of imprisonment. His sentence should be reduced under § 1B1.13(b)(6) because he has served over ten years of an unusually long sentence and because changes in law regarding the use of "stacked" convictions under 18 U.S.C. § 924(c) have resulted in a gross disparity between the sentence he received and the sentence that he would likely receive today. Additional factors, such as Ordaz's rehabilitation while incarcerated, the gross disparity of a sentence that is fifty years longer than that of any of his co-defendants, and his family support should he be released, further weigh in favor of sentence reduction under amended guideline § 1B1.13(b)(5). Ordaz's family eagerly awaits his return to Oaxaca, Mexico, to where he will likely be deported upon his release. Counsel respectfully requests that the Court hear oral argument on this motion.

## **INTRODUCTION**

When Ordaz was just ten years old, a local gang in his neighborhood of Fresno, California began pursuing him. For years, the Fresno Bulldogs repeatedly picked on Ordaz, stole his belongings, and pressured him into joining their ranks. He tried to avoid this lifestyle, but, at the

age of sixteen, as a new father and while working on a farm to support his family, Ordaz turned to the gang that had targeted him for years. Nonetheless, Ordaz continued to seek a better life for himself and his family through legitimate means, eventually moving to Wyoming to get away from the gang and to work full time in construction. But eventually, after losing work during the Great Recession and struggling to support his family of four, Ordaz returned to the gang that had pursued him his whole life. At the age of thirty-two, for his participation in a drug trafficking conspiracy, he was sentenced to a sixty-five-year term of imprisonment, functionally a life sentence.

For the drug trafficking conspiracy counts, Ordaz received a sentence of ten years. The remainder—and overwhelming majority—of his sentence was attributable to two firearms charges under 18 U.S.C. § 924(c) based on Ordaz's possession of firearms in connection with the drug trafficking conspiracy. At the time, the Honorable Nancy D. Freudenthal was required to impose a collective mandatory minimum of fifty-five years for the § 924(c) charges—due to the now-discredited practice often referred to as "stacking." At sentencing, Judge Freudenthal expressed concern that Ordaz's mandatory minimum sentence was too long, stating, "I, too, am concerned about the length of this sentence, Miguel." Ordaz Sentencing Tr. 32:8–9, Dkt. No. 593 (hereinafter "Sentencing Tr.").

That sentencing regime was abolished by the First Step Act of 2018, in which Congress clarified that the mandatory (and consecutive) sentences for "second or subsequent" violations of § 924(c) should apply only after the first such conviction has become final. Pub. L. 115-391, § 403, 132 Stat. 5194, 5221–22 ("First Step Act" or "FSA"). Because Ordaz received both of his § 924(c) convictions in the same case, the second § 924(c) count would no longer trigger the enhanced sentence that he received. As a result of the First Step Act and other changes in law, if he were sentenced today, Ordaz's sentence would likely be twenty years shorter.

Though the First Step Act's change to § 924(c)'s sentencing regime was not made retroactive by Congress, numerous district courts and circuit courts, including the Tenth Circuit, held that significant sentence disparities created by that change can constitute "extraordinary and compelling" circumstances warranting a sentence reduction under § 3582(c)(1)(A). *See Maumau*, 993 F.3d at 837 (affirming the district court's decision to grant relief considering the "incredible" length of the stacked mandatory sentences, the First Step Act's elimination of stacking under § 924(c), and the disparity in the sentence the defendant would receive today).[1]

Effective November 1, 2023, the Commission issued guidance that resolved a circuit split regarding whether a non-retroactive change in law could be an extraordinary and compelling reason warranting a reduction in sentence and reaffirmed the approach taken by the Tenth Circuit in *McGee* and *Maumau*.[2]  *See* § 1B1.13(b)(6).  The Commission also clarified that such guidance

---

[1]    *See also United States v. Ruvalcaba*, 26 F.4th 14, 28 (1st Cir. 2022) (reasoning a "district court adjudicating [compassionate release] may consider the FSA's non-retroactive amendments . . . on a case-by-case basis grounded in a defendant's individualized circumstances to find" extraordinary and compelling reasons) (abrogated in part by *United States v. Duluc-Méndez*, 156 F.4th 55, 60 n.1 (1st Cir. 2025) (holding that § 1B1.13 must be considered for motions filed after November 1, 2023)); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020) (holding "the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances"); *United States v. Chen*, 48 F.4th 1092, 1101 (9th Cir. 2022) (finding "[t]he district court erred when it declined to consider" sentencing disparities caused by the First Step Act's "non-retroactive changes to § 924(c) stacking"); *United States v. Martinez*, No. 2:01-CR-00564, 2024 WL 866822, at *4 (D. Utah Feb. 29, 2024) (granting a sentence reduction to time served where fifty-five years of sixty-five-year sentence arose from § 924(c) mandatory penalties, and there was "a clear, gross disparity . . . created by a non-retroactive change in law").

[2]    This issue is currently before the Supreme Court, which, in order to resolve a new circuit split, will decide whether a district court may consider disparities created by the First Step Act's prospective changes in sentencing law when deciding whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i). *Carter v. United States*, 145 S. Ct. 2775 (2025) (No. 24-860) (granting certiorari); Pet. for Writ of Cert. at *i, *13–14, *Carter v. United States*, 145 S. Ct. 2775 (2025) (No. 24-860).  For purposes of the present motion, under current Tenth Circuit law, courts may consider non-retroactive changes in sentencing law, despite other circuit courts' decisions to the contrary.  *See McGee*, 992 F.3d at 1046–48.  District courts across the country are continuing to grant motions like Ordaz's

applied to prisoner-initiated motions.  § 1B1.13(a).

As amended, § 1B1.13 explicitly provides that a non-retroactive change in sentencing law can be an "extraordinary and compelling" reason that warrants a reduction in sentence when: (a) the defendant is serving an unusually long sentence; (b) the defendant has served at least ten years of the sentence; and (c) an intervening change in the law has produced a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed.  § 1B1.13(b)(6).  Ordaz satisfies all of these criteria.

On April 30, 2025, Ordaz submitted a written request to the warden of USP Beaumont asking that the Bureau of Prisons ("BOP") file a motion to reduce his sentence pursuant to § 3582(c)(1)(A)(i).  More than 30 days have since passed with no response.  Ordaz has thus exhausted his administrative remedies and is entitled to bring his motion directly to this Court.

## FACTUAL AND PROCEDURAL BACKGROUND

Ordaz moved from Oaxaca, Mexico to Fresno, California with his parents when he was two years old.[3]  Ordaz's father was at different times a farm worker and a truck driver, and his mother worked as a machine operator at a chicken and turkey packing company.  As such, both parents were often away from home.  Growing up the child of hard-working parents who worked long hours to make ends meet, Ordaz was frequently left home alone caring for his three younger siblings.  Unfortunately, gang activity was ever-present in Fresno.  Starting when Ordaz was in

---

while the Supreme Court considers this issue.  *See, e.g.*, *United States v. Taylor*, No. CR 03-04, 2025 WL 2210414, at *2–3, (D. Mont. Aug. 4, 2025) (finding extraordinary and compelling reasons to reduce sentence under § 1B1.13(b)(6) where a non-retroactive change in law meant defendant had been sentenced in "a different 'era' that encouraged draconian sentences"); *Kelly v. United States*, 789 F. Supp. 3d 434, 442–44 (E.D. Va. 2025) (reducing sentence under § 1B1.13(b)(6) where a non-retroactive change in law made it unlikely that the defendant would receive the same life sentence today).

[3]  Ordaz was living as a permanent resident in the United States until his arrest, and his permanent resident card expired in 2014 while he was incarcerated.

4

just fifth grade, a local gang, the Fresno Bulldogs, began pressuring him to join its ranks. The gang members picked on Ordaz and stole things from him when he initially refused. For years as a young teen, Ordaz resisted the gang's recruitment efforts and helped shield his sister, Elvia, from gang harassment.

At only sixteen years old, Ordaz became a father to his first son, Isaiah, and dropped out of school to work on a farm to provide for his family. Three months later, still a kid himself, Ordaz and Isaiah's mother broke up, and he turned to alcohol to cope. His dependence on alcohol ultimately contributed to a series of poor decisions that he deeply regrets, including succumbing to the pressure to join a gang.

Despite his drinking problem, Ordaz worked hard in minimum wage jobs over the following years to provide for Isaiah, who lived with him, sometimes holding down two jobs at the same time. At the age of twenty-five, Ordaz married Martha Mota, with whom he had two children, Miguel and Saleene. Even while supporting his young family, Ordaz returned to education and received his G.E.D. in 2005. Ordaz and Mota separated in 2006, but he remains in close contact with Miguel and Saleene to this day.

During the Great Recession, at the age of thirty, Ordaz relocated to Wyoming with his sons Isaiah and Miguel to pursue better job opportunities and provide a safer, more positive environment for his family away from the challenges of gang activity in Fresno. In Wyoming, he lived with his girlfriend, Emma Flores, and the pair had their first child. During this period, Ordaz worked six days a week in construction to support his family and was described by his employer at the time as an "excellent" employee who was able to juggle work and caring for his family. Revised Presentence Investigation Report ¶ 68. Unfortunately, as the economy continued to decline, work became harder to come by. Ordaz, concerned with how he would provide for his

family, turned back towards the gang, which had developed a presence in Wyoming, and joined an ongoing conspiracy to distribute methamphetamine for which he was arrested in November 2010. He learned that Emma was pregnant with their second child just days before his arrest.

After he was indicted for the conspiracy, Ordaz was offered a plea bargain that would have resulted in a forty-year sentence. Ordaz refused to turn against his co-conspirators because he could not abide contributing to a possible near-life sentence for another person in exchange for avoiding one himself. Instead, Ordaz exercised his right to a jury trial and was sentenced to a then-mandatory additional twenty-five years in prison as a result.

On March 5, 2012, Ordaz was sentenced on one count of conspiracy to possess and distribute methamphetamine, one count of distribution of methamphetamine, one count of conspiracy to launder money, one count of possession of an unregistered firearm, and two § 924(c) counts. J. 1, Dkt. No. 564. He received a sentence of 120 months—the bottom of the applicable Guidelines range—on the non-§ 924(c) counts and a then-mandatory consecutive sentence of fifty-five years on the two § 924(c) counts, for an aggregate sentence of sixty-five years in prison[4] *See id.* at 3. Though his convictions were admittedly serious and involved weapons possession, Ordaz's convictions did not entail any violent acts.

Because of the firearms charges brought under § 924(c), Ordaz also fared much worse than his co-defendants. The longest sentence any co-defendant received was 240 months, ***forty-five years*** less than Ordaz. Moreover, three of his co-defendants had their sentences reduced by Judge Freudenthal or this Court in 2015 following amendments to the Sentencing Guidelines. *See* Orders Regarding Sentence, Dkt. Nos. 662, 669 & 670. Following these reductions, Ordaz remains the

---

[4]    Ordaz received a mandatory thirty years for the first § 924(c) count and twenty-five years for the second § 924(c) count because it was then considered a "second or subsequent conviction" under § 924(c)(1)(A).

only individual involved in the drug trafficking conspiracy still incarcerated, despite all individuals' culpability in the conspiracy to traffic methamphetamine being substantially similar.[5]   Ordaz's sentence is based almost entirely on the § 924(c) charges on which he was convicted.  In contrast, another of Ordaz's co-defendants was charged with two § 924(c) counts, but, due to his cooperation with prosecutors, only pled guilty to one of those charges, and received a total sentence of ten years of incarceration.  Morgan Sentencing Tr. 9:17–20, 29:23–25, 30:1, Dkt. No. 618.  This massive disparity in outcomes cries out for a sentence reduction under both § 1B1.13(b)(5) and § 1B1.13(b)(6).

Ordaz will be eighty-six years old at the time of his 2066 release date.  If not granted a sentence reduction, it is likely that Ordaz will die in prison.  Additionally, Ordaz was living in the United States as a permanent resident at the time of his arrest, but given that the government previously provided the court with an immigration detainer, which was filed on the docket, *see* Dkt. No. 24, it appears likely that he would be released into Immigration and Customs Enforcement custody and deported upon release, presumably to Mexico.  *See id.* (noting Ordaz's "[n]ationality" as "Mexico").  Assuming Ordaz survives his sentence and is deported at the age of eighty-six to Mexico, where he has not lived since he was two years old, it is likely that he could not become self-reliant in that new country and that he would need to rely on the charity of others in his remaining years.

If Ordaz were sentenced today, this Court would have the discretion to impose a significantly shorter sentence—one that more closely aligns with what the sentencing judge

---

[5]    All of Ordaz's co-defendants were charged with Count 1, conspiracy to possess and distribute methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), and all but one co-defendant were charged with Count 2, conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(h).  Superseding Indictment 2–3, Dkt. No. 64.  Both counts have a ten-year mandatory minimum sentence.  *Id.* at 8.

believed was fair.  At sentencing, Judge Freudenthal had severely limited discretion.  She repeatedly expressed concern about the severity of Ordaz's sentence but explained that her hands were tied.  She stated, "I, too, am concerned about the length of this sentence, Miguel.  I believe that the guideline sentence is more punitive," Sentencing Tr. 32:8–10, and added "I do believe that the resulting sentence is still punitive and greater than necessary, but it is what the law requires." Sentencing Tr. 33:12–14.  Presumably, Judge Freudenthal meant that an aggregate sentence of sixty-five years was "greater than necessary" to establish the purposes of sentencing set forth in 18 U.S.C. § 3553(a) but that the court did not have any other choice.  Judge Freudenthal also told Ordaz that she would "vary on the conspiracy and drug-related counts down to the minimum mandatory sentence" but that she had "no choice but to follow the law" and therefore could not impose a lower sentence.  Sentencing Tr. 32:20–23.  Indeed, Judge Freudenthal stated, "I wish there were more I could do."  Sentencing Tr. 34:3.

The very purpose of the First Step Act was to return discretion to judges for cases just like Ordaz's and remove BOP from its role as ultimate gatekeeper.  To that end, for example, § 603(b) of the First Step Act authorized inmates to file motions under § 3582(c)(1)(A) for the express purpose of "increasing the use" of sentence reductions.  First Step Act § 603(b).  Previously, such motions could be made only by BOP.  *See id.*; § 3582(c)(1)(A).  Today, this Court has the ability to correct the injustice that Judge Freudenthal so clearly wanted to avoid but could not by reducing Ordaz's sentence to a more appropriate term of forty-five years or such other significantly reduced sentence the Court feels reflects the current state of the law and Ordaz's rehabilitation.

On April 30, 2025, Ordaz submitted a written request to the warden of USP Beaumont asking BOP to file a motion to reduce his sentence pursuant to § 3582(c)(1)(A)(i).  Because more than thirty days have passed since this request was submitted, without response from the warden,

Ordaz is entitled under § 3582(c)(1)(A) to bring his motion directly to this Court, which he now does, together with his request for oral argument.

## **ARGUMENT**

Ordaz is squarely eligible for relief under the recent amendments to § 1B1.13 and Tenth Circuit law. The Commission's recent amendment to § 1B1.13 reaffirms what the Tenth Circuit has already held—that a non-retroactive change in the governing sentencing law can be an extraordinary and compelling reason to reduce a sentence as part of an individualized analysis. *McGee*, 992 F.3d at 1045 (holding that district courts can "determine for themselves what constitutes 'extraordinary and compelling reasons,' but that this authority is effectively circumscribed by . . . the requirement that a district court find that a reduction is consistent with applicable policy statements issued by the Sentencing Commission pursuant to § 994(a)(2)(C) and (t)"). As the Commission's policy statement covers sentence-reduction motions filed by the defendant, § 1B1.13(a), and authorizes such reductions in the precise circumstances presented here, *see* § 1B1.13(b)(5), (6), this Court should determine that Ordaz deserves relief under § 3582.[6]

This Court may reduce Ordaz's sentence so long as: (1) he has complied with § 3582's

---

[6]    Any claim by the government that the Commission lacked authority to amend its own policy statement to provide the guidance that became effective on November 1, 2023 must fail. Not only is such a position directly at odds with the one the Department of Justice ("DOJ") took before the Supreme Court and the Tenth Circuit, but it is also substantively wrong. Notably, in several filings in the Supreme Court when the Commission had no quorum, DOJ took the position that the Commission was the appropriate forum to resolve the circuit courts' differing views. *See* Br. for the United States in Opp'n to Grant of Cert. at 16–17, *Jarvis v. United States*, 142 S. Ct. 760 (2022) (No. 21-568). Indeed, Congress expressly delegated to the Commission the task of determining which circumstances should be considered "extraordinary and compelling" within the meaning of § 3582. *See* 28 U.S.C. § 994(a)(2)(C), (t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples."). What is more, given the chance to review and reject such guidelines, Congress permitted them to enter into force. *See* § 994(p). The Commission's revision to § 1B1.13 is entirely valid.

requirement that he allow BOP 30 days to respond to his written request for a motion; (2) the Court finds that his case presents "extraordinary and compelling" circumstances under § 1B1.13; and (3) a reduction is appropriate under the factors described in 18 U.S.C. § 3553(a).  As set out below, Ordaz meets those criteria, and a sentence reduction is warranted in his case.

## I.    Extraordinary and Compelling Circumstances Warrant a Reduction in Ordaz's Sentence

Section 3582(c)(1)(A) allows a court to reduce a sentence for "extraordinary and compelling" reasons, as long as the "reduction is consistent with applicable policy statements issued by the Sentencing Commission."   After the recent amendment, § 1B1.13(b)(6) now explicitly states that judges may consider whether non-retroactive changes in law that create a gross disparity between the sentence being served and the sentence likely to be imposed at the time of the motion combine with the individual circumstances of the defendant to warrant relief. § 1B1.13(b)(6); *see also United States v. Brooks*, 717 F. Supp. 3d 1087, 1095, 1099 (N.D. Okla. 2024) (rejecting the government's argument that § 1B1.13(b)(6) is invalid and reducing the defendant's sentence for two stacked § 924(c) convictions); *United States v. Moreira*, No. 06-20021-01, 2024 WL 378032, at *1–2 (D. Kan. Jan. 31, 2024) (reducing life sentence for drug conspiracy to 292 months where "defendant received an unusually long sentence"); *United States v. Carrera Ramirez*, No. 2:00-CR-105-3, 2024 WL 54429, at *1, *3 (D. Utah Jan. 4, 2024) (granting a sentence reduction based on the court's findings that the defendant's thirty-five-year sentence for armed robbery predicated on stacked § 924(c) convictions was "incredible" when compared to what she would face today and that the § 3553(a) factors weighed in favor of release).

Amended guideline § 1B1.13(b)(5) also retains the existing "Other Reasons" catchall from the previous policy statement, explaining that extraordinary and compelling reasons exist where "[t]he defendant presents any other circumstance or combination of circumstances that, when

considered by themselves or together," are "similar in gravity" to other enumerated reasons, such as a defendant's serious medical condition, advanced age, or victimhood of abuse. § 1B1.13(b)(5). In promulgating § 1B1.13(b)(5), the Sentencing Commission endorsed the approach of numerous district courts in the Tenth Circuit that have properly considered factors such as the defendant's rehabilitation, the discrepancy between the defendant's sentence and the sentences of his co-defendants, and strong family support in granting sentence reductions under § 3582(c)(1)(A)(i). *See, e.g.*, *United States v. Martínez Encinias*, 682 F. Supp. 3d 993, 1007–08 (D.N.M. 2023) (finding that "while it is not a standalone justification for compassionate release," defendant's rehabilitation served as "an additional extraordinary and compelling basis for release"); *United States v. Payne*, No. 94-CR-150, 2022 WL 2257044, at *5 (N.D. Okla. June 23, 2022) ("[T]he length of sentence compared to similarly culpable co-defendants also qualifies as a further 'extraordinary and compelling' reason."); *United States v. Gantt*, No. 10-10175-01, 2023 WL 2140151, at *5–6 (D. Kan. Feb. 21, 2023) (stating the presence of "strong family support is important" and, in combination with a sentence far exceeding average and defendant's rehabilitation, constituted an extraordinary and compelling reason for defendant's release); Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index, at 10 (explaining "[t]he Commission recognized that during the period between the enactment of the First Step Act in 2018 and this amendment, district courts around the country based sentence reductions on dozens of reasons and combinations of reasons" and that the catchall guideline was intended to permit judges to continue to determine whether "circumstances or [a]

combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction"). [7]

Ordaz establishes extraordinary and compelling circumstances under both § 1B1.13(b)(6), due to the two-decade "gross disparity" between the sentence imposed and the one he would likely receive today, and under § 1B1.13(b)(5) due to his rehabilitation while incarcerated, the severity of his sentence compared to his co-defendants, and his strong family support system.

A.    Ordaz's Excessively Long Sentence and the Change in the Law Are Extraordinary and Compelling Reasons That Warrant a Reduction Under § 1B1.13(b)(6)

Section 1B1.13(b)(6) provides that an extraordinary and compelling reason for a sentence reduction exists where (1) the defendant is serving an unusually long sentence; (2) the defendant has served at least ten years of the sentence; and (3) an intervening change in the law has produced a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed. § 1B1.13(b)(6). Ordaz meets all three requirements.

*First*, Ordaz's sixty-five-year sentence is "unusually long" on its face. In 2024, only about 1.3% of all offenders nationwide, and only 0.8% of drug trafficking offenders, were sentenced to a term of thirty years or more. [8] Nationally, the average sentence imposed for federal drug trafficking offenses was eighty-two months, while the average sentence for a murder conviction across all districts was 274 months. [9] This means that not only is Ordaz's sentence ***698 months*** longer than the average drug trafficking sentence, but he is also serving a prison term nearly ***three***

---

[7]    Official text of the adopted amendments, policy statement, official commentary, and statutory index, as submitted to Congress on April 27, 2023, is available on the United States Sentencing Commission website at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf

[8]    *Interactive Data Analyzer*, U.S. Sent'g Comm'n, (2024), https://ida.ussc.gov/analytics/saw.dll?Dashboard.

[9]    *Id.*

*times* longer than the average sentence of someone who has committed murder—when he did not fire a single shot nor harm anyone during the course of his offense conduct.  In all manner of measurement, Ordaz's sentence is unusually long.

*Second*, there is no dispute that Ordaz has served more than ten years of this sentence.  *See* § 1B1.13(b)(6).

*Third*, an intervening change in the law has produced a gross disparity between Ordaz's current sentence and the sentence that would likely be imposed today.  Ordaz was sentenced before the First Step Act.  At the time of his sentencing, enhanced, consecutive mandatory minimums applied to a "second or subsequent" § 924(c) conviction—even when the convictions arose from the same case.  *See Deal v. United States*, 508 U.S. 129, 131–32 (1993).  The First Step Act clarified that these enhanced mandatory minimums only apply when a defendant commits a subsequent violation after a prior § 924(c) conviction "has become final."    18 U.S.C. § 924(c)(1)(C), *as amended by* First Step Act, § 403 (titled "Clarification of Section 924(c) of Title 18, United States Code").  Instead of the combined fifty-five-year sentence for two § 924(c) counts, under current law, Ordaz could receive a thirty-five-year sentence, twenty years shorter than the one he is serving.  In this case, there is a "clear, gross disparity . . . created by a non-retroactive change in law." *Martinez*, 2024 WL 866822, at *4.

As discussed, courts throughout the country, including those across the Tenth Circuit, have relied on § 1B1.13(b)(6) to reduce the sentences of defendants serving grossly disparate terms of imprisonment.  *See, e.g.*, *id.*; *United States v. Wright*, No. 07-CR-0038, 2025 WL 1202057, at *5 (N.D. Okla. Apr. 25, 2025) ("[D]istrict courts in this circuit have considered the length of a defendant's sentence and the FSA's elimination of sentence-stacking under § 924(c), along with the defendant's individualized circumstances, to determine whether extraordinary and compelling

reasons support a reduction in sentence." (collecting cases)); *United States v. Barkley*, No. 04-CR-119, 2024 WL 5233183, at *6 (N.D. Okla. Dec. 27, 2024) (granting a sentence reduction where "the FSA's amendments to § 924(c)'s penalty provisions produced a gross disparity between the length of [defendant's] mandatory minimum 300-month sentence for his second § 924(c) conviction and the mandatory minimum eighty-four month sentence he would face today for the same conviction"); *United States v. Doddles*, No. CR-06-136, 2024 WL 4521379, at *1–2 (W.D. Okla. Oct. 17, 2024) (granting a sentence reduction from 480 months to time served because the elimination of § 924(c) stacking would result in the defendant "receiving a significantly lower sentence today" and because of a disparity between the defendant's sentence and his co-defendants' sentences); *United States v. Eads*, 749 F. Supp. 3d 1149, 1158 (D. Colo. 2024) (reducing sentence to time served in light of an intervening change in the law, the addition of § 1B1.13(b)(6), the fact that defendant had served approximately half the sentence he would likely have received today, and the fact that a similarly situated defendant had already been released).

> B.   Under § 1B1.13(b)(5), the Combination of Ordaz's Rehabilitation, the Gross Disparity Between His Sentence and the Sentences of His Co-Defendants and His Strong Family Ties Constitutes an Additional Extraordinary and Compelling Reason Warranting a Reduction

Separate and apart from the "unusually long sentence" that Ordaz is serving, his rehabilitation while incarcerated, the severity of his sentence compared to those of his co-defendants, and his family support and strong release plan all weigh in favor of a sentence reduction under § 1B1.13(b)(5).

Although "[r]ehabilitation of the defendant alone" is not a basis for a sentence reduction, 28 U.S.C. § 994(t), numerous courts have held rehabilitation may nonetheless provide such a basis in combination with other factors. *See, e.g.*, *United States v. Ogun*, 657 F. Supp. 3d 798, 810–11 (E.D. Va. 2023) (noting "that rehabilitation, alone, does not constitute an 'extraordinary and

14

compelling reason'" but nonetheless "agree[ing] that [d]efendant's rehabilitation and postconviction conduct is 'commendable,' and even . . . 'extraordinary and compelling'" in combination with other factors); *United States v. Malone*, No. 99-CR-12, 2021 WL 2371605, at *7 (N.D. Okla. June 9, 2021); *see also* § 1B1.13(d) ("However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.").

Ordaz is not the same man today that he was when he entered prison over fifteen years ago. Despite the severity of his sentence, he has devoted his energy to turning his life around. Ordaz has dedicated himself to education, hard work, and service. He has taken dozens of courses, consisting of over 975 hours of instruction, in topics ranging from employable skills like computer applications courses to life skills like parenting, anger management, and money management, and he is currently on the waitlist for additional courses. *See* Ex. A, Education Data Transcript. Ordaz currently works in general maintenance, putting his construction and carpentry skills to use around the Beaumont facility, while also learning new skills in plumbing and HVAC repair. In that role, BOP trusts Ordaz and his coworkers in locations across the prison, including on the roof of the facility, to make whatever repairs are needed. He also serves as an instructor for Inside Recreation. He previously worked as an orderly and in the commissary and, prior to the COVID-19 pandemic, tutored other inmates as they prepared for their GED. These experiences speak to his readiness both mentally and practically to reenter society as a responsible and service-oriented citizen. In recognition of this growth, BOP staff recently transferred Ordaz to a preferred housing unit, a "honor dorm" reserved for inmates with employment and no recent disciplinary infractions. *See* Ex. B, Individualized Needs Plan at 3–4.

Perhaps his greatest accomplishment in prison has been his working on and maintaining his sobriety and his completion of the Challenge Program, *see* Ex. C, Certificate of Completion of Challenge Program, a cognitive-behavioral program for individuals who suffer from substance abuse issues and/or mental illness.[10]  The Challenge Program uses "behavioral protocols and a modified therapeutic community model" that "have been demonstrated to be effective in other [BOP] treatment programs," as well as "mental health interventions" grounded in "strong empirical support."[11]  The Challenge Program—as its name suggests—challenged Ordaz to reconsider his thinking and hold himself accountable for his past behavior.  Courts have taken particular note of the Challenge Program in deciding to grant sentence reductions in the past, and so too should this Court.  *See United States v. Crenshaw*, No. 2:90-CR-117, 2025 WL 618869, at *10–11 (E.D. Va. Feb. 26, 2025) (granting a sentence reduction and noting that defendant's participation in the Challenge Program "reflects well on [d]efendant's rehabilitative growth and intrinsic motivation"); *United States v. Cruz*, No. 3:94-CR-112, 2021 WL 1326851, at *13, *15 (D. Conn. Apr. 9, 2021) (granting a sentence reduction and describing participation in the program as "[p]articularly noteworthy"); *United States v. Espino*, No. 03-20051-08, 2022 WL 4465096, at *4 (D. Kan. Sept. 26, 2022) (finding one aspect of the defendant's significant rehabilitation was that he "completed the Challenge Program and then stayed in the program to assist other participants in it").  To further solidify his progress, Ordaz also successfully completed the Non-Residential Drug Abuse Program in March 2018 and has remained clean and sober.  *See* Ex. D, Certificate of Completion of Non-Residential Drug Abuse Program.  He finds comfort in the ritual

---

[10]    *See* Fed. Bureau of Prisons, Directory of National Programs 10 (2017), https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgramCatalog.pdf.

[11]    *Id.*

of reading the Bible daily in prison and is devoted to improving himself mentally and spiritually.

Additionally, in March 2025, Ordaz received a Psychological Assessment from BOP's Psychology

Services department which stated that:

> Ordaz has evidenced a desire for betterment and self-growth by his initiative of reaching out to Psychology Services to participate in any additional programming . . . . Moreover, he has shown a willingness to engage in treatment related discussion as well as continuously inquiring about strategies and coping skills for self-improvement.

Ex. E, BOP Psychology Services Diagnostic and Care Level Formulation.

Ordaz recognizes that over the years he sometimes failed to live up to his best self, struggled to avoid the violence of prison, and received discipline infractions during his incarceration. Most of Ordaz's disciplinary infractions occurred in 2020 or before, with many concentrated in the worst periods of the COVID-19 pandemic, which was a particularly tense time across the country, not to mention in prison facilities that were perpetually locked down. *See* Ex. F, Chronological Disciplinary Record. Since 2020, Ordaz has only received one additional infraction, which indicates his commendable journey of self-improvement.[12] Recognizing that rehabilitation is an ongoing process, courts have granted reductions to defendants with a disciplinary record who are able to demonstrate a positive trend in their disciplinary history and behavior. *See United States v. Locust*, 771 F. Supp. 3d 819, 831–32 (E.D. Va. 2025) (granting sentence reduction despite twelve prison disciplinary violations, still finding that the defendant's "rehabilitation to a degree favors a sentence reduction"); *Brooks*, 717 F. Supp. 3d at 1099 (granting reduction despite the fact that defendant's disciplinary history "reflect[ed] a long history of

---

[12] The March 2024 infraction was for possessing a dangerous weapon. Ex. F, Chronological Disciplinary Record. Ordaz has been previously identified by other inmates as a member of a gang and readily admits that he carried the item for his own protection. However, he regrets this decision and has not received discipline since this incident.

infractions" including nine assaults with serious injuries); *United States v. Ware*, 720 F. Supp. 3d 1351, 1355, 1364 (N.D. Ga. 2024) (granting reduction notwithstanding the seriousness of the defendant's crimes and several disciplinary violations where the defendant's more recent prison record was clean, he had completed numerous educational programs, and he had become a well-regarded UNICOR employee); *United States v. Mason*, No. 03-0321-4, 2023 WL 24169, at *6 (D. Md. Jan. 3, 2023) (granting reduction even though the defendant's "prison conduct [was] not perfect," noting "there [were] signs that he is maturing and gaining insight, meaning that prison has been serving its deterrent and rehabilitative purposes"); *United States v. Johnson*, No. 05-CR-00167, 2021 WL 5037679, at *2 (N.D. Cal. Oct. 30, 2021) (granting motion for compassionate release based in part on the fact that "[defendant's] disciplinary history from the BOP shows decreasing seriousness over time"). Thus, the positive trend in Ordaz's disciplinary history in recent years is important proof of his rehabilitation, as evidenced by BOP's recent decision to move Ordaz to a preferred housing unit and its categorization of Mr. Ordaz as "low risk" for recidivism. Ex. B, Individualized Needs Plan at 3.

Courts have also seen fit to consider the severity of a defendant's sentence relative to his co-defendants in granting sentence reductions. *See Doddles*, 2024 WL 4521379, at *1–2 (granting a sentence reduction from 480 months to time served because the elimination of § 924(c) stacking would result in the defendant "receiving a significantly lower sentence today" and because of a disparity between the defendant's sentence and his co-defendants' sentences); *United States v. Eccleston*, 573 F. Supp. 3d 1013, 1019–20 (D. Md. 2021) (granting defendant's motion for compassionate release on the basis of a single extraordinary and compelling reason consisting of a sentencing disparity among co-defendants); *United States v. Payton*, No. 06-341, 2021 WL 927631, at *1–2 (D. Md. Mar. 11, 2021) (granting reduction where defendant's more culpable co-

defendant had benefitted from three changes in the sentencing regime and been released). If Ordaz lives to see his anticipated release date, which even with good time credit is forty years from now, he will be eighty-six years old. In stark contrast, all of his co-conspirators currently walk free. Three of his co-defendants pleaded guilty to conspiracy charges and received sentences ranging from sixty to seventy months. *See* Js., Dkt. Nos. 460, 461 & 462. Additionally, one co-defendant was originally charged with two § 924(c) counts but, due to his cooperation, only ended up receiving a sentence of 120 months. Morgan Sentencing Tr. 9:17–20, 29:23–25, 30:1, Dkt. No. 618. Three other co-defendants were found guilty at trial for their roles in the conspiracy and received sentences between seventy and 240 months. *See* Js., Dkt. Nos. 529, 544 & 563. Furthermore, three of his co-defendants had their sentences reduced by Judge Freudenthal or this Court in 2015 following amendments to the Sentencing Guidelines. *See* Orders Regarding Sentence, Dkt. Nos. 662, 669 & 670. Following these reductions, Ordaz's sentence is almost ***fifty years longer*** than that of any of the other individuals involved in the drug trafficking conspiracy, despite their offense conduct being substantially like his or more violent. The difference in sentences is based largely on the stacked § 924(c) charges. Reducing his sentence would serve to remedy this gross disparity.

Finally, Ordaz has a strong familial support system and release plan which courts have looked favorably upon when considering whether to reduce a defendant's sentence. *See, e.g.*, *Gantt*, 2023 WL 2140151, at *1, *5 (defendant convicted of a § 924(c) violation for his role in a bank robbery, where no one was physically injured during the commission of the offense, was granted sentence reduction in part due to the fact that he "has done well in prison" by maintaining a job and remaining in contact with family who all have expressed their willingness to support him once released); *United States v. Williams*, No. 5:94-CR-39, 2024 WL 4189735, at *5 (M.D. Ga.

19

Sept. 13, 2024) (granting a sentence reduction and noting that the defendant had completed hundreds of hours of educational courses, received various certifications, expressed an intention to mentor young people, and received various letters of support confirming his growth and acceptance of responsibility).

Throughout his incarceration, Ordaz has maintained close contact with his family, and they eagerly await his release. His mother, Leonor, and father, Tomas, are hardworking people who have maintained gainful employment throughout their lives, are now in their sixties and seventies, respectively, and are desperately hoping for Ordaz's release. *See* Ex. G, Ltr. of Leonor Ordaz ("I am now of advanced age, and it is my fervent hope—supported by my prayers—that you, as esteemed legal professionals, will lend your expertise to help restore his freedom."). He speaks with them and his three siblings, Elvia, Tomas, and Esmeralda, frequently and has been fortunate to build a strong relationship over the phone with his nieces and nephews. *See* Ex. H, Ltr. of Jennifer Ordaz ("My youngest daughter . . . feels this loss deeply. She longs to hug him, to see him at her birthday parties and milestones. She's always the first to run to the phone when he calls, and it breaks my heart to see their bond limited by distance, knowing how much stronger it could be if he were here with us."). One of his deepest regrets is knowing that, by committing the crime that led to his incarceration, he deprived his five children of having a father figure who can be fully present in their lives. Ordaz has done his best to maintain his connection with his children through phone calls and cards during his incarceration. *See* Ex. I, Ltr. of Isaiah Ordaz ("He has always been supportive and caring, and I believe that if given the opportunity, he will work hard to make up for the lost time and be the father I need in my life."); Ex. J, Ltr. of M.O. ("[E]ven in his absence, he contacted us [making] an effort to get to know me. I hope he will be given an

opportunity to return home and be apart [sic] of my life.").[13]  Additionally, Ordaz has supportive extended family in Oaxaca, Mexico, who would greet him with open arms should he be deported to Mexico.  His uncle, Jose Julio Guzman Garcia, has pledged to help Ordaz maintain housing and employment and to give Ordaz the tools he needs to get back on his feet and become a contributing member of the local community.  Ex. K, Ltr. of Jose Julio Guzman Garcia, with certified translation ("I declare that I offer him my full support, so that he may have refuge, a home, food, and a job, as he is a hardworking and responsible person who will be under my care.").  In short, Ordaz has a strong support system in both the United States and Mexico and a stable environment to reenter after prison.

## II.    The § 3553(a) Factors Weigh Strongly in Favor of Reducing Ordaz's Sentence

When deciding a motion under § 3582(c)(1)(A)(i), a court must consider the defendant's rehabilitation, his history and characteristics, and other factors that bear on who he is *today*.  *See* § 3582(c)(1)(A) (requiring consideration of the § 3553(a) factors); § 1B1.13(a) (same); § 3552(a) (requiring consideration of "the history and characteristics of the defendant"); *Pepper v. United States*, 562 U.S. 476, 492 (2011) (explaining that evidence of rehabilitation "provides the most up-to-date picture" of a defendant's "history and characteristics" (quoting § 3553(a)(1))).

Ordaz's present characteristics and the relevant factors under § 3553(a)—including, but not limited to, the fact that he never committed a violent crime, his rehabilitation in prison, family support, and likely release to Mexico—not only demonstrate that he poses no risk of danger to the safety of others but also further establish that he would benefit society upon release.

---

[13]    Pursuant to Local Criminal Rule 49.1.1, this motion and the attached exhibits do not include the names of minor children, including those of Ordaz's two minor daughters, M.O. and S.O.

Ordaz's rehabilitation while in prison weighs in favor of a sentence reduction. Ordaz's post-sentencing rehabilitation is "highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing[,]" including the defendant's history and characteristics as well as the need for the sentence imposed to afford deterrence and to assess the danger the defendant poses to the community. *See Pepper*, 562 U.S. at 491; *see also United States v. Watts*, No. 92-CR-767, 2023 WL 35029, at *12 (E.D.N.Y. Jan. 4, 2023).

Over the past fifteen years, Ordaz has transformed personally, intellectually, and professionally. He is now forty-seven years old and understands the mistakes he made as a younger man and how to avoid those same behaviors in the future. In addition to overcoming a yearslong battle with alcohol and substance abuse—which began as a way to cope with the tremendous stress of his tumultuous teenage years—Ordaz has completed educational and other courses geared toward reentry, in topics ranging from employable skills, like computer applications courses, to life skills like parenting, anger management, and money management. *See* Ex. A, Inmate Education Data Transcript. As discussed above, Ordaz also completed the highly regarded Challenge Program in 2016 and has committed to a life clean and sober from alcohol and drugs. Ex. C, Certificate of Completion of Challenge Program.

In light of Ordaz's impressive personal growth, subjecting him to four additional decades of prison time, particularly given the disparities discussed above, would serve only to "unnecessarily continue his punishment" rather than contribute to further rehabilitation. *See United States v. Tuakalau*, 598 F. Supp. 3d 1222, 1227 (D. Utah 2022). Indeed, even a modest reduction to Ordaz's sentence would better prepare him to reenter society and obtain the educational classes he needs than the sentence he is currently serving. Due in part to his extremely long sentence, Ordaz currently sits on the waiting list for classes, as inmates with earlier release

dates are prioritized. *See* Ex. B, Individualized Needs Plan at 3. Moving up his release date would help him enroll in and take more classes while incarcerated in anticipation of his ultimate re-integration into society. Further, as other courts have recognized, even a reduction that leaves some time on a sentence "will help [the defendant] and the Bureau of Prisons plan for his ultimate release from custody." *United States v. Urkevich*, No. 8:03-CR-37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019); *see also* § 3553(a)(2)(D) (requiring courts to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). In these ways, a sentence reduction could reinforce Ordaz's rehabilitation, give him a light at the end of the tunnel, and incentivize his continued upward trajectory.

Ordaz understands the seriousness of his crimes and feels deep remorse for his involvement. He has accepted full responsibility for his actions and has already endured significant punishment. A sixty-five-year prison sentence is simply not necessary to serve the goals of punishment under § 3553(a). Section 3553(a)(2)(A) requires that a sentence "reflect the seriousness of the offense . . . and to provide just punishment for the offense." Though his crimes were undoubtedly serious, their impact was not so severe that he should be locked up for what is effectively the rest of his life. As set out below, a longer sentence is also not necessary to deter him from committing any future crimes.

## III.    Ordaz Is Not Dangerous

Finally, Ordaz does not pose a danger to any other person or to the community at large, 18 U.S.C. § 3142(g)(4), nor is a longer sentence needed to protect the public, § 3553(a)(2)(C). *See also* § 1B1.13(a) (directing courts to consider the factors set forth in 18 U.S.C. § 3553(a) and § 3142(g)). Section 3142(g) requires the Court to evaluate a defendant's dangerousness based on his present circumstances, rather than on his past conduct alone, and directs the Court to consider

"the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  Ordaz has never been convicted of a violent crime. To be sure, Ordaz made grave errors of judgment.  But at the time he committed his crimes, Ordaz was a young father of four struggling to make ends meet during the financial crisis and suffering from alcohol and substance abuse problems.  Since then, Ordaz, now forty-seven years old, has matured greatly—as evidenced by his relationship with his children, his completed coursework, and his rehabilitation in prison.  Indeed, BOP has rated Ordaz as being a "low risk" for recidivism. Ex. B, Individualized Needs Plan at 3.  These developments show that he has the tools necessary to continue on his constructive path.  If released, Ordaz will receive strong support from his family, who will help him readjust to life outside prison.

While Ordaz does not present a danger to the community here in Wyoming, also relevant to this Court's decision is that given Ordaz's immigration detainer, if released, he would likely be deported to Mexico.  *See* Dkt. No. 24.  There he would be supported by his extended family currently living in Oaxaca, Mexico, and especially by his uncle, Jose Julio Guzman Garcia, who is ready to provide Ordaz whatever he needs to get back on his feet.  *See* Ex. K, Ltr. of Jose Julio Guzman Garcia.  Additionally, Ordaz's California-based family, including his children, parents, and siblings, have pledged to visit him in Mexico, and Ordaz's father still owns a house in Oaxaca. His many family members have offered to support Ordaz financially and emotionally, and they know that he will contribute meaningfully to society.  *See, e.g.*, Ex. L, Ltr. of Elvia Ordaz ("Our family is fully prepared to support Miguel in every way possible upon his release.  We are ready to provide him with a stable home, employment opportunities, and a network of love and encouragement to ensure he succeeds."); Ex. M, Ltr of Tomas Ordaz ("Miguel was a skilled and hardworking professional, employed as a carpenter specializing in construction, kitchen cabinet

remodeling, and other trades that contribute positively to the community. His talents and work ethic demonstrate his potential to be a productive member of society once more."); Ex. N, Ltr. of Tomas F. Ordaz ("[H]e has made it clear that he is committed to turning his life around."); Ex. O, Ltr. of S.O. ("My father is a hardworking man with a good heart. . . . We are ready to welcome him back with open arms and help him reintegrate into society."); Ex. J, Ltr of M.O. ("[H]e is always supportive and loving towards me, and if given the chance I believe he will work hard to get a bond between me and him and rebuild his life.").

## CONCLUSION

For the foregoing reasons, Ordaz respectfully requests the Court to use the authority conferred on it by the First Step Act, as clarified by the amended policy statement, to reduce his sentence and reiterates his request for oral argument on this motion. Despite serving more than fifteen years in prison already, Ordaz's projected release date is not until 2066. Absent relief he will likely die in prison. From every perspective, and most importantly from the perspective of the goals of sentencing set forth in § 3553(a)(2), there is no legitimate reason to continue his incarceration, and there are many good reasons to afford him the second chance he has commendably worked to earn.

Dated:          February 27, 2026
                New York, New York


                            Respectfully submitted,


_/s/ Taylor Booth_                          _/s/ Deborah Roden_

DEBEVOISE & PLIMPTON LLP                    WOODHOUSE RODEN AMES &
Taylor Booth (NYSB 5866835)*                BRENNAN LLC
Maxwell D.A. Dikkers (NYSB 6073068)*        Deborah Roden (Wyo. Bar 6-3866)
Isabel Gutenplan (NYSB 6180830)*            1912 Capitol Avenue, Suite 500
66 Hudson Blvd.                             Cheyenne, Wyoming 82003
New York, NY 10001                          debb@wrablaw.com
tebooth@debevoise.com                       Phone:  (307) 432-9399
mddikkers@debevoise.com
iagutenplan@debevoise.com
Phone:  (212) 909-6000                      _Counsel to Miguel A. Ordaz_


_Counsel to Miguel A. Ordaz_
_* Admitted Pro Hac Vice_

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2026, I electronically filed the foregoing paper in the U.S. District Court for the District of Wyoming by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 27, 2026
        New York, New York

                              */s/ Taylor Booth*
                              DEBEVOISE & PLIMPTON LLP
                              Taylor Booth (NYSB 5866835)*
                              66 Hudson Blvd.
                              New York, NY 10001
                              tebooth@debevoise.com
                              Phone:  (212) 909-6000

                              *Counsel to Miguel A. Ordaz*
                              *\* Admitted Pro Hac Vice*